UNITED PRESS ASS'NS v. NATIONAL NEWSPAPERS' ASS'N.

(District Court, D. Colorado.    September 6, 1915.)

No. 6111.

1. CONTRACTS ⬥�longdash⟩313—ANTICIPATORY BREACH—RENUNCIATION.

A renunciation of the obligations of a contract by one of the parties must be unequivocal, and of the entire contract, to constitute an anticipatory breach, and must be accepted by the other party, to render the breach actionable as a basis for the recovery of damages.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1279; Dec. Dig. ⬥�longdash⟩313.]

2. DAMAGES ⬥�longdash⟩125—BREACH OF CONTRACT—FAILURE TO PAY INSTALLMENTS DUE—FUTURE PROFITS.

Under a contract by plaintiff to furnish to defendant news reports for a daily paper for a term of years, to be paid for weekly in advance, the failure of defendant to make the weekly payments after part performance was not such a breach of the contract in its entirety in a legal sense as to entitle plaintiff, on discontinuance of the service, to recover as damages future profits it might have made during the remainder of the term, but it might, at its election, terminate the contract and recover for past service, or continue performance and recover therefor.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 339–343; Dec. Dig. ⬥�longdash⟩125.]

At Law.    Action by the United Press Associations against the National Newspapers' Association.    Judgment for plaintiff for part of claim.

Tyson Dines, Jr., of Denver, Colo., and Glendy B. Arnold, of St. Louis, Mo., for plaintiff.

Jno. T. Bottom, of Denver, Colo., and Frank M. Lowe, of Kansas City, Mo., for defendant.

LEWIS, District Judge.    The plaintiff is a New York corporation; its business is the gathering of news throughout the United States and other countries, preparing news reports thereon and selling said reports, with the privilege of publishing the same, to newspaper publishers throughout the United States.

The defendant is a Colorado corporation, and owns and publishes the Kansas City Post at Kansas City, Missouri.

In 1909 plaintiff and defendant entered into a written contract by which the plaintiff agreed to furnish and the defendant agreed to take for its newspaper at Kansas City the Full Day and Saturday Night news reports at a named consideration to be paid weekly in advance. The reports were to be brought into Kansas City and delivered over telegraph or telephone lines, and the defendant further bound itself to provide a suitable room in the office of the Kansas City Post for the plaintiff's operator, and also to furnish to the plaintiff free of charge the local news which might be gathered by the defendant within twenty-five miles of said office.

The life of the contract extended to November 1, 1914.    The contract was executed on both sides to the mutual satisfaction of the

parties, barring an occasional complaint by each, until the 7th day of February, 1911. On that day the defendant wired Mr. Lee, plaintiff's vice-president, as follows:

"We desire to notify you that we do not find the United Press service satisfactory nor according to your representations to us. You will therefore discontinue the daily service after this week. We would like to contract with you for your Saturday Night service alone."

On the same day Mr. Lee replied, expressing surprise at the notice and saying, "We feel that your contract obligations should be fulfilled;" that he believed the service valuable to the Post and to discontinue would represent a serious loss to the plaintiff. On February 11, 1911, F. G. Bonfils, acting for the defendant, notified the plaintiff's local agent, who had charge of the plaintiff's office in the building and rooms where the Post was printed, that the defendant had determined that it would no longer take the plaintiff's day service; that it would like to make a new arrangement by which the plaintiff would furnish the defendant the night service (Saturdays), but that if the new arrangement could not be made plaintiff would have to vacate its office with the Post, concluding:

"We request a definite and positive answer, and would ask that you take time to obtain such answer in full from your company and, until that time, the matter will be left open."

On February 14, 1911, Mr. Lee for the plaintiff wrote Mr. Bonfils, representing the defendant, acknowledging receipt of Mr. Bonfils' letter of the 11th, addressed to the local agent at Kansas City. Mr. Lee again expressed surprise at the attitude of the defendant, and refers to an interview which he had recently had with the manager of the Post, in which it had been suggested that the defendant had expressed a desire to discontinue the plaintiff's service, and says that the plaintiff does "not feel justified in altering the terms of our agreement"; urges that the agreement be kept, points out the advantages to both parties in keeping it, and closes:

"If you can suggest some more equitable adjustment of the matter, we will, of course, be pleased to give it every consideration."

The controversy was then dropped. The plaintiff's agent remained at his office in the Post and received and delivered to the defendant news reports sent by the plaintiff, and the defendant gave the plaintiff's agent at the Post access to the local news which it had gathered. But the defendant did not make the weekly payments stipulated for in the contract. While matters were in this condition and on March 10th, 1911, Mr. Lee, who was then at Kansas City, sent a letter on the part of the plaintiff to the defendant in which he called attention to the clause of the contract requiring the weekly payments to be made in advance, stating that the defendant was then in arrears for five weeks ($875), ending the next day,

"and we notify you that unless arrearages are paid up and your weekly payments in advance begun on March 13th, 1911, we will consider your default as a breach by you of the contract, and will proceed to collect the amount then owing for service actually rendered, and the damages accruing to us on account of the failure on your part to carry out the contract."

The arrearages were not paid as demanded, and on March 13th, the plaintiff gave up its office with the Post, took its receiving agent away and took out its facilities for receiving and delivering to the Post its news reports.

Thereafter on March 22, 1913, plaintiff brought this action to recover the $875 and damages claimed to have accrued to it for the alleged breach of the contract on the part of the defendant. The defendant's answer admits the indebtedness of $875 and the plaintiff is, of course, entitled to a judgment for that amount without more; but the defendant denies that it broke the contract; alleges that the service rendered by the plaintiff was poor and inefficient and not in accord with what it conceived was the obligation of the plaintiff under the contract, and then alleges:

"That notwithstanding said frequent complaints, said failure on the part of plaintiff to comply with the terms of its contract continued until on or about the 11th day of March, 1911, when plaintiff surrendered and abandoned the contract sued on and discontinued its service to defendant of both day and Saturday night service, removed its wires and operator from the office of this defendant, and thus terminating by its own unlawful acts the contract upon which the petition in this cause is founded."

The first question then for consideration under the pleadings and proof is whether the conduct of the defendant was such as to operate as a breach of the contract on its part and thus constitute a basis for an action for damages.

[1] 1. There is no doubt that the defendant's telegram of February 7th, and letter of February 11th, to the plaintiff were declarations of renunciation on its part, and if the plaintiff had accepted them as such they would have been equivalent, for the purposes in hand, to a breach by the defendant; for an accepted renunciation operates as a breach. No man can complain if he is taken at his word. But the plaintiff did not accept the renunciation. It entered into a discussion as to the advisability for such action from the standpoint of each of the parties; it continued to render the services required of it under the contract for more than a month thereafter, and accepted performance, in part, on the part of the defendant. A renunciation of the obligations of a contract by one of the parties must be unequivocal and of the contract and its obligations in its entirety, in order to operate as an anticipatory breach. When that has been done the other party has an option open to him which he must exercise before he is entitled to maintain an action for damages as for breach of the contract; i. e., he must accept the renunciation, and then he can sue. If he does not desire to take his adversary at his word and accept the renunciation he may treat it as inoperative and keep the contract open; i. e., he may reject the renunciation; and in that event he cannot sue as for a breach of the contract. If the contract remains open it is open for all purposes and for the benefit of all parties. Its obligations on each party for performance stand unaffected by prior notice of renunciation and its rejection. In support of this principle it is hardly necessary to cite more than Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953, s. c., 84 Fed. 565, in which the au-

thorities, English and American, are exhaustively reviewed. For additional authority in support of the proposition see Marks v. Van Eeghen, 85 Fed. 853, 30 C. C. A. 208; GaNun v. Palmer, 202 N. Y. 483, 96 N. E. 99, 36 L. R. A. (N. S.) 922; Roeblings Sons Co. v. Fence Co., 130 Ill. 660, 22 N. E. 518.

A very early declaration of the rule is found in Hochster v. De La Tour, 2 E. & B. 678, to which many of the authorities in this country refer. It was later said by Lord Campbell, Chief Justice, speaking for the Court of Queen's Bench, in Avery v. Bowden, 5 E. & B. 714:

"According to our decision in Hochster v. De La Tour (2 E. & B. 678) to which we adhere, if the defendant, within the running days and before the declaration of war had positively informed the captain of The 'Lebanon' that no cargo had been provided or would be provided for him at Odessa, and that there was no use in his remaining there any longer, the captain might have treated this as a breach and renunciation of the contract; and thereupon, sailing away from Odessa, he might have loaded a cargo at a friendly port from another person; whereupon the plaintiff would have had a right to maintain an action on the charter party to recover damages equal to the loss he had sustained from the breach of contract on the part of the defendant. The language used by the defendant's agent before the declaration of war can hardly be considered as amounting to a renunciation of the contract; but, if it had been much stronger, we conceive that it could not be considered as constituting a cause of action after the captain still continued to insist upon having a cargo in fulfillment of the charter party."

On appeal to the Exchequer Chamber the judgment was affirmed notwithstanding it was there further noted that it appeared:

"That in conversation between plaintiff and defendant in England, after the declaration of war between England and Russia, defendant told plaintiff that he had determined not to load the ship, but to rely on the Chapter of Accidents, and that he had telegraphed to his agent at Odessa not to purchase a cargo."

The principle was adhered to in Johnston v. Milling, 16 Q. B. D. 470, decided in 1886.

[2] 2. The plaintiff having declined to accept the renunciation of the contract declared by the defendant on February 7th and 11th, we come to consider the only other ground on which it could be claimed that the defendant had committed a breach as a basis for the recovery of damages, to-wit, its failure to comply with the written demand of the plaintiff made on March 10th:

"We notify you that unless arrearages are paid up and your weekly payments in advance begun on March 13th, 1911, we will consider your default as a breach by you of the contract, and will proceed to collect the amount then owing for services actually rendered, and the damages accruing to us on account of the failure on your part to carry out the contract."

It is unnecessary to give extended consideration to the failure of the defendant to pay the arrearages as demanded as constituting a breach. The non-payment of the several instalments constituting the sum of the "arrearages," weekly in advance, had undoubtedly been waived by the plaintiff in its continuing to furnish reports thereafter. The matter of importance in this respect is the failure of the defendant to pay in advance the instalment for the ensuing week, which,

confessedly, it did not do. Did this failure constitute a breach of the contract in such legal sense as to enable the plaintiff, by reason thereof, to recover as damages future profits which it might have made for the remainder of the term? This is the character of the relief which it seeks. The contract was entire, and was not broken up into separate parts as separate contracts on account of the provisions for payment by weekly instalment. After performance was begun the failure of the defendant to pay an instalment, as provided in the contract, would not absolve the plaintiff from its obligation to continue performance on its part, unless it terminated the contract for such failure. The contract itself did not undertake to give any other effect to such failure to pay than that placed on it by the law. True, the obligation to pay each instalment in advance was in the nature of a condition precedent, yet it was an independent covenant, and for each default there was only the ensuing legal remedy therefor. Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12, 29 L. Ed. 366; Cherry Valley Iron Works v. Florence Iron River Co., 64 Fed. 569, 12 C. C. A. 306; Manufacturing Co. v. Royer Wheel Co., 105 Fed. 324, 44 C. C. A. 523.

In Loud v. Land & Water Co., 153 U. S. 564, 578, 14 Sup. Ct. 928, 932 (38 L. Ed. 822) it is said:

"In the learned note of Serjeant Williams to the early case of Pordage v. Cole, 1 Saund. 320a, it is said that 'if a day be appointed for payment of money, or part of it, or for doing any other act, and the day *is* to happen, or *may* happen, *before* the thing which is the consideration of the money, or other act, is to be performed, an action may be brought for the money or for not doing such other act *before* performance; for it appears that the party relied upon his *remedy*, and did not intend to make *performance* a condition precedent; and so it is where *no time* is fixed for performance of that which is the consideration of the money or other act.' "

The principle was directly presented and considered in Wharton v. Winch, 140 N. Y. 287, 35 N. E. 589, and it is there said:

"It is undoubtedly true that the defendant's failure to pay the instalment was such a breach of the contract as absolved the plaintiff from all obligation to further perform on his part while the default continued. Nor was he bound to grant the defendant any indulgence, and wait for any period of time, in order to enable him to make good his broken promise. In that sense, punctual payment was a condition precedent. The obligation of the plaintiff to proceed under the contract depended upon it. If it was not fulfilled, one of two courses was open to the plaintiff. He might at once rescind the contract and refuse to go on, and immediately recover for the materials furnished and the services rendered under it; or he might proceed with the performance of the contract on his part, and at the same time, if he chose, bring suit to recover the past due instalments."

Also in Beatty v. Lumber Co., 77 Minn. 272, 79 N. W. 1013, it is said:

"It is doubtless true that a failure to pay the instalment due was a breach of the terms of the contract, and they were not bound to wait for the defendant to make the payment, and plaintiffs then had the right to abandon the contract, or they might have continued to perform the services, and have brought suit for the instalments due. Although the plaintiffs abandoned the contract on the very day of the defendant's failure to pay them the instalments due, yet the defendant placed no obstacle in the way of their going on with the work, unless a failure to pay the instalment due can be so regarded.

But there is nothing in the contract which makes a failure to pay an instalment due at a stated time a condition precedent to the further prosecution of the work, and which made its non-payment such a violation of the contract as to authorize the other party to abandon the work, and sue upon it as for having been prevented from completing it by the act of the party who had thus failed to perform such condition precedent; hence the law cannot infer such a consequence from the ordinary obligation to pay money at a particular time or upon the completion of a specified part."

The same principle is given recognition and enforced in the following: Cox v. McLaughlin, 52 Cal. 590; Id., 54 Cal. 605; Porter v. Reservoir Co., 100 Cal. 500, 35 Pac. 146; Bethel v. Salem Imp. Co., 93 Va. 354, 25 S. E. 304, 33 L. R. A. 602, 57 Am. St. Rep. 808; Palm v. O. & M. R. Co., 18 Ill. 217; Christian Co. v. Overholt, 18 Ill. 223; Moore v. Taylor, 42 Hun (N. Y.) 45, 58; Kendall B. N. Co. v. Com'rs, 79 Va. 563; Weber v. Insurance Co., 5 Mo. App. 51, 55; Fitzgerald v. Hayward, 50 Mo. 516; Bean v. Miller, 69 Mo. 384.

It may be that the action taken by the plaintiff on March 10th as above noted, and thereafter in withdrawing its agent and appliances from the defendant's office and declining to further perform the contract on its part was somewhat induced by the telegram and letter which it received from the defendant on February 7th and 11th, but we have already seen that its failure to then take the defendant at its word and stand upon an anticipatory breach had the effect of keeping the contract open for the benefit of both parties; and thereafter the defendant did nothing upon its part, except its failure to pay instalments, that in any wise indicated that it would not continue to perform the contract. The plaintiff's agent remained in its office and furnished the reports as required by the contract, and it furnished to the plaintiff the news locally gathered. And of more importance is the fact that the plaintiff indicated by its notice to the defendant of March 10th that it did not in any respect take the threatened action on its part for any other cause than defendant's failure to meet the instalments. We therefore, feel that the principle of law declared in the cases above cited is directly applicable, and that the plaintiff is not entitled to recover profits which it would have made by continuation of performance as damages.

I attach hereto a finding of facts, and have indicated on the margin the action of the court on each request for instruction.

The defendant has conceded that five instalments are unpaid, for which the plaintiff will have judgment, with interest thereon from March, 1911, at eight per cent., making a total sum of $1,190.00 and costs, and judgment is so ordered.